Mrs. Jewell MULLINS, Plaintiff-Respondent,

v.

SAM SCISM MOTORS, INCORPORATED, and Sam Scism, Defendants-Appellants.

No. 7764.

Springfield Court of Appeals.

Missouri.

Jan. 8, 1960.

Briney & Welborn, Bloomfield, for appellants.

Bloodworth & Bloodworth, Poplar Bluff, for respondent.

McDOWELL, Judge.

This is an action for breach of warranty growing out of the sale of an automobile. In the trial below the cause was submitted to the jury for breach of implied warranty resulting in a verdict and judgment for plaintiff in the sum of $1,160 and interest of $110.21. Defendants appealed.

The suit was against defendants, Sam Scism Motors, Inc., and Sam Scism, and the Ford Motor Company.

The petition alleged inter alia that on November 9, 1956, plaintiff purchased a new Ford automobile from Sam Scism Motors, Inc., and Sam Scism; that the vehicle was manufactured by defendant, Ford Motor Company; that all of the defendants impliedly warranted said motor vehicle to be new and in first class condition and free from all defects; that appellants-defendants warranted the same "by both implication and by their contract in writing" to be in first class condition, of superior quality and free from defects; that said automobile so purchased by plaintiff was not in first class condition, was not of superior quality and was not free of defects but was poorly constructed and of greatly inferior quality in that its steering mechanism was faulty, its frame and wheels were sprung, the body was sprung and misshapen causing the rain to enter the interior of the automobile around the windshield, doors, back windows and trunk and that the heater leaked and when in operation and because of the misfitting windshield excessively loud and whistling noises were produced and that the exterior paint was a poor quality and soon faded. That as a result of the windshield and back window leaks, the interior of said automobile had been damaged; that as a result of the heater leaks the floor rugs have rotted and come apart and plaintiff has been deprived of the use of said automobile to plaintiff's damage in the sum of $2,000.

Defendant, Ford Motor Company, in its answer admitted it was the manufacturer and that the defendant, Sam Scism Motors Inc., was the Ford Dealer and denied all other allegations and specifically denied any warranty as alleged. Defendants Sam Scism Motors Inc., and Sam Scism admitted the Ford dealership, the sale to plaintiff of the new Ford in question but denied all other allegations.

Said defendants likewise filed a cross claim against the Ford Motor Company alleging that if said motor vehicle was defective, as alleged, the defects were caused by the Ford Motor Company and that if Sam Scism and Sam Scism Motors, Inc., were adjudged liable to plaintiff, prayed judgment against the Ford Motor Company for such sum and for attorney fees for being forced to defend the petition. A separate trial was awarded by the court on the cross claim.

At the close of plaintiff's evidence the court directed a verdict in favor of defendant Ford Motor Company and against plaintiff and the cause proceeded against defendants Sam Scism Motors, Inc., and Sam Scism.

Plaintiff's evidence shows that she is a resident of Farmington and that defendant Sam Scism is engaged in the sale of automobiles in Flat River under the corporate name of Sam Scism Motors Inc.; that on November 9, 1956, plaintiff purchased from defendants a new 1957 Ford automobile, price $2,132. The day prior to the purchase, one Hubbard, salesman for defendants, took the car to Farmington to show plaintiff and her husband; he took them for a ride a few blocks about town; plaintiff's husband remarked to the salesman that the car rattled and he didn't think it was any good. Hubbard stated that the car had just come in and they had not had time to correct the rattles but that the car would be checked and be all right if plaintiff bought it.

The next day plaintiff went to defendants' place of business and purchased the car. At time of purchase she talked to both the agent, Hubbard, and defendant, Sam Scism, about the rattles and was informed by them that they would certainly take care of that; that immediately after the purchase she discovered the heater was leaking and the windshield was making a noise; that when it rained the windshield leaked a little; that the first windshield did not leak as much as the second one; that the doors and trunk leaked from the very first time it rained. She gave this testimony:

"Q. How about the rear window? A. That is right, on both corners at the bottom.

"Q. What effect, if any, did this water entering around the windshield have upon the interior of your automobile? A. It shows it has leaked.

"Q. How does it show it? A. Rain spots.

"Q. Where are those spots? A. Around the windshield, they are on the upholstery, on the sides, around the doors."

Plaintiff complained about these leaks to the defendants as soon as she noticed them after it rained. She went to defendants' place of business and talked to them about it. She testified:

"Q. What, if anything, did they do to correct them? A. They dabbed some stuff around the windshield, they said to correct the wind. They didn't pay much attention to the other, in the first windshield."

Her evidence is that the car never steered properly; that it always pulled to the side; that the paint on the right fender was discolored and looked like it had been repaired; that the heater leaked from the beginning and let the anti-freeze come through on the interior of the car; she had to have the heater disconnected. Some sixty days after the purchase plaintiff was introduced by defendant, Scism, to an adjuster of the Ford Motor Company at defendants' place of business. The adjuster examined the windshield and said it was a misfit and ordered a new one. The new one was not replaced until August due to a cyclone striking in the community and injuring so many cars that defendants could not get to it. The evidence is that the new windshield did not fit; that it was improperly installed and leaked at the top. Nothing was ever done by the defendants to remedy the leaks in the doors and heater. Witness said she talked to defendant many times with reference to these defects and he would say "I don't make the cars, Jewell, I just sell them", and laugh about it.

On cross-examination plaintiff testified at the time she bought the automobile she did not rely upon any advertisements over the radio or television programs and had not seen any pamphlets regarding automobiles made by the Ford Company. She stated that at the time the salesman brought the car over to demonstrate it, she looked at it and it was the same car she bought. Plaintiff admitted she had driven the car 11,000 miles and had had it about eighteen months. She gave this evidence:

"Q. How soon was it that you started noticing something wrong with it, was it just as soon as you got it, the first day? A. I think I had it about a week, maybe two weeks, something like that. I drove it to St. Louis. I just happened to be in front of a place on Broadway and it wouldn't feed any gas and I couldn't do a thing about it then, I just had to stop. This fellow said it was a bolt or screw fell out."

She testified she took the car back to defendant for the ninety day check-up and at that time told them of the windshield and the heater trouble and the leaks. She gave this testimony:

"Q. What do you mean, the leaks around the windshield? A. Around the doors, around the trunk, around the back window.

"Q. They did take some sticky cement or something of that sort and put up around the windshield, didn't they? A. Yes, and the back glass too.

"Q. Who all have you taken the car to, to try to have something done to it, besides Scism, anybody? A. Yes, I have taken it to Farmington Body Shop to have them look at it."

She stated that Bill Hughes at the Farmington Body Shop looked at the car after the matter was turned over to Judge Swink for suit and that she had a Mr. Boone at Farmington test the car.

Witness testified that she called the Ford Motor Company and they sent their man down to the defendants' place of busi-

ness where she talked to him in the office, which was after the second windshield was installed, about two weeks; that she told him about the windshield and complained about the heater, leaks and everything, including the paint on the quarter paneling. She gave this answer: "A. He didn't offer to put in a windshield, he said there was nothing wrong with that windshield." She testified that he and Mr. Scism tried the car out.

Billy Gene Hughes testified for plaintiff that he operated a body shop in Farmington and had been in that business about seven years; that he had been to Fisher Body School. He said he examined plaintiff's car in November, last year; that the first thing he did was to drive it on rough road and pavement; that plaintiff complained the car did not drive right and had a few rattles; that he drove it possibly 15 or 20 miles and brought it back to the shop, checked it over and found that the windshield did not fit the opening panel; that the whole roof panel and front body pillars were not put in satisfactorily; that as a result of the windshield not fitting, he observed leakage of water seeping in; that water stains were in both right hand corners of the car and water ran down across the dash and under it, down over the kick pads where it fits up against the wall; that the windlace that goes around the door on the inside to keep the wind from coming in was stained with water and had turned white; that he observed in the back where the head liner comes down on the side of the back glass, above the back seat lining that the car was water stained where the back glass had leaked. He said that the windshield did not fit and the back glass was almost like the windshield, not quite as bad, the water had leaked in around both corners the way it fits, the body did not fit properly. He gave this evidence:

"Q. Is there any adjustment that a mechanic such as you, a body man, can make to make the windshield fit an automobile? A. Not when the hole is too big. If it is too small you can. * * *

"Q. Were these openings, both rear and front, on Mrs. Mullins' car too large or too small? A. They were too large or it never would have leaked."

Witness testified that he observed the right rear fender; that paint had been spotted on it. He said there had been a scratch and the company had attempted to paint it; that neither door fitted properly; that the left front door touched at the top but had a gap a little better than a quarter of an inch at the bottom. He gave this evidence:

"Q. What, if anything, did you observe about the doors on this automobile? A. Neither door fit properly. * * *"

Witness said he observed a hole in the floor mat on the driver's side; that the left rear trim pad was loose and the arm rest was loose. These things could be repaired. He testified that after making a test drive of the car he found it pulled to the right. When asked what caused this, he stated: "The front end had to be out of line or it would not pull. * * *" Witness said he inspected the heater, it was corroded and had water stains at the bottom but, at the time, had been disconnected. He said the trunk lid was leaking and he observed water stains on the inside. As to value, witness said it would cost the price of the car to put it back like it should be.

On cross-examination he said it would take $2,100 to fix it; that the body would have to be replaced.

Thurman Frank Edgar testified for plaintiff that he is an automotive mechanic living in Farmington. He said he had had about 15 years experience; that on the 21st day of May, 1958, he spent about an hour and a half or two hours making an examination of this car; drove it on a gravel road. He testified that the windshield had a lot of noise when driving; that there was quite a bit of body calking which had run down around the top of the windshield and the chrome strip; that the windshield was out of line and leaking on each side,

the lower end. He gave this answer: "It was just a misfit, the windshield didn't fit in there right." He testified that while driving the car it had rattles in the front end and a tendency to pull to the right of the road. He gave this answer: "It is out of line, the front end is out of line on it".

Witness said the steering mechanism could be adjusted; that the shock absorbers were completely worn out; that he could tell the windshield leaked because of the water stains around the upholstering and the glass; that the trunk lid was out of line and the trunk lining mildewed, water streaks on it. He corroborated the evidence of the other witnesses as to the defects of the heater.

On cross-examination he said he examined the car on the 21st day of the month and it had approximately 11,000 miles on it.

Frank Lewis testified for plaintiff that he was in the grocery business in Flat River; that from 1926 until 1935 he had been employed by General Motors to work at Fisher Body and was engaged in inspection in the assembly plant; that he had also worked in the Chevrolet Plant. He testified he was acquainted with the value of automobiles such as the Ford in issue. He corroborated plaintiff's other testimony as to the defects in the car and the water stains on the head lining, which is a part of the upholstery that covers the roof. He said there was a stain about six inches wide and a foot and half long at a point sort of spread out towards the dome light. He gave this answer: "I would say there is only the chassis and wheels and motor available there. The car with the defects wouldn't be worth over $200.00 at the most."

The defendants offered the following evidence. Harry Lackamp testified that he operates a body shop in Arcadia; that defendant, Scism, brought the car in question to him on May 16, 1958, and presented him with a list of plaintiff's complaints. He testified he drove the automobile and checked it as to these complaints. He found there was air noise around the windshield; that the heater was disconnected and out of the car; that the door on the left side did not shut properly and needed adjustment of the hinges; that the car drove good considering the 11,000 miles use. The steering gear was good, the sun shades were loose, as he stated "a little sloppy"; there was nothing wrong with the transmission, the brakes were in good shape and he found no evidence of leaks in the trunk. There were slight stains down below the heater, a little discoloration. Witness did not look for stains around the back windows. He stated the windshield fitted properly. He observed there had been an attempt to caulk the glass to prevent leaks. The garnish moulding around the windshield was not properly installed, the screws were not secured and it was left in a haphazard condition, the rubber that goes across the dash was out. He stated that the replacement of the windshield was a bit of a messy job. He found nothing wrong with the body.

Andrew Lang, a representative of Ford Motor Company, inspected the car in May, 1957. He stated that plaintiff complained about the windshield and nothing else; that he might have said to her, "It is plain to see the windshield is a misfit". Witness ordered the windshield replaced.

Gene G. Bunz, representative of Ford Motor Company, testified that he examined the car in 1957; that plaintiff called him in St. Louis and complained about the wind noise, stained head lining, water and heater leaks and the paint on the right quarter panel; that he found nothing wrong with the windshield. He found a round spot near the dome light in the head lining; that the heater was leaking and that the quarter panel was off color; that the car steered nicely and the brakes worked. He offered to replace the floor mat that he had torn; the heater and to refinish the rear panel and reseal the rear window. He stated that plaintiff refused the repairs and wanted a new car. Witness said that he found the trunk lid was out of alignment

slightly but he found no stains on the trunk mat.

John Phelan, a mechanic for Scism Motor Company, testified that at the 1,000 mile check-up, plaintiff complained only of windshield noise; that at this time the car was in good running condition except for the wind noise.

Fred Hubbard, salesman of the defendants, testified that plaintiff had tried the car out before it had been serviced, admitted that her husband had complained that the car sounded noisy and that he told plaintiff that the valves were not adjusted and the tappets were noisy and it had to have a pre-delivery adjustment service. He stated that the next time he saw plaintiff she thought the car was running smoothly; that when she brought the car for the 1,000 mile check-up the only complaint made was an excessive wind noise.

Arthur Bone, a service station manager, testified he had bought and sold cars for 25 or 26 years; that he was acquainted with plaintiff's car; that plaintiff asked him to look at it, probably four or five months after she bought it. She complained of water stains through the windshield. He testified that the reasonable market value of the car at the time was $1700 or $1800. He did not recall seeing water damage. He did not find water leaks in the trunk that would reduce the value. He testified that, in his opinion, it would be impossible to construct a car which some windshield would not fit.

Defendant, Sam Scism, testified he gave the witness a warranty at the time of purchase identical to defendant's exhibit (B). He said the warranty is a standard one of Ford Motor Company, issued by authorized Ford dealers for the year 1957. Witness stated that when plaintiff brought the car in for the 90 day check-up she complained only about wind noise; that at the time witness Lang was there in May, 1957, plaintiff did not complain of the steering, the back seat jumping, the trunk, the windows, about the car being out of line or the shock absorbers. He stated Lang authorized a replacement of the windshield; that when replaced the moulding protruded a little on one end and that plaintiff grabbed it and jerked it out and stated she was not going to have it. Witness stated that when Bunz was there, plaintiff complained about the windshield strip, the heater leaking, the wires protruding under the dash, faded paint on right rear quarter panel and faded spot on head lining; that he drove the car and found no more wind noise than in any 1957 model; that he thought the installed windshield was a good fit; that Bunz agreed to replace the head lining, refinish the rear quarter panel, replace the heater but plaintiff wanted nothing but a new car. He testified that at time of sale the reasonable market value of the car was $2,132; that when he last saw the car May 16, 1958, the reasonable market value was $1,500. It had 11,000 miles on it. When he inspected the car in 1957, the reasonable market value was $2,000. Witness said he never did see anything wrong with the windshield; that the first windshield was cut a little short, the second one was a much better fit. He said plaintiff's first complaint was in the latter part of March about the windshield noise.

Defendant offered to prove the reasonable rental value for the time plaintiff had the car to be $75 per month, which offer was rejected by the court.

In rebuttal plaintiff denied receiving the written warranty offered in evidence by defendants.

In our opinion we will refer to appellants, Sam Scism and Sam Scism Motors, Inc., as defendants and respondent as plaintiff, the position occupied by the parties in the lower court.

Under the first alleged error defendants complain of the action of the trial court in denying their motion for directed verdict at the close of all of the evidence, assigning as reason therefor that plaintiff submitted her case on the theory of an im-

plied warranty when the evidence is to the effect that she purchased the car for her own personal use and not for any special use and in Missouri there is no implied warranty in such instances.

To sustain this contention defendants cite State ex rel. Jones Store Co. v. Shain, 352 Mo. 630, 179 S.W.2d 19, and Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469.

In State ex rel. Jones Store Co. v. Shain, 352 Mo. 630, 179 S.W.2d 19, plaintiff brought suit against the Jones Store Company for breach of implied warranty of fitness for a particular purpose, which she claimed was an incident of the sale. The evidence showed that plaintiff purchased a blouse for her own use from the Jones Store, a retailer. The Jones Store had bought the blouse from a reputable manufacturer. Nothing in the appearance of the blouse indicated that it would be harmful to anyone who might wear it. Plaintiff wore the blouse and thereafter developed dermatitis, which, she alleged, was caused by harmful chemicals in the blouse. She recovered judgment for $3,000 in the trial court, which judgment was affirmed by the Kansas City Court of Appeals, one Judge dissenting. The judgment was affirmed on the basis that, in the sale and purchase of the blouse, there was to be an implied warranty that it was fit for the particular purpose of being worn by the plaintiff. The cause was taken by certiorari to the Supreme Court on alleged conflict with previous decisions of that court. The opinion in the Kansas City Court of Appeals, Marra v. Jones Store Co., 170 S.W.2d 441, was quashed by the Supreme Court en banc. The ground for decision was that the controlling previous decisions of the Supreme Court denied the implication of a warranty covering injuries resulting from the wearing of the blouse, since such wearing of the blouse was an "ordinary use" and not a "particular purpose". On page 20 of 179 S.W.2d the court stated:

"In considering the question as to whether there was an implied warranty that the blouse would be suitable for personal wear by the plaintiff, it should be noted that it appears from the opinion that the relator was not the manufacturer or producer of the article sold to the plaintiff, but was a retailer; that the alleged harmful quality in the article was a latent defect unknown to the relator, and that an inspection of the blouse would not have disclosed any defect.

" * * * 'Our law is, that the buyer takes the risk of quality and condition, unless he protects himself by a warranty, or there has been a false representation fraudulently made by the vendor.' This decision was cited and the rule of caveat emptor reaffirmed in the more recent case of Barton v. Dowis, 315 Mo. 226, 285 S.W. 988, 51 A.L.R. 494, which will be hereinafter discussed."

On the same page the court considered the opinion in Hunter v. Waterloo Gasoline Engine Co., Mo.Sup., 260 S.W. 970, 973, and stated:

" * * * In that case it was held that there is ordinarily no implied warranty of suitability in the sale of merchandise by a retailer, but there is an exception where the vendor 'undertakes to supply an article for a particular purpose, knowing that the buyer trusts to his judgment that the article is suitable for that purpose.' "

In the Hunter case it was held there was an implied warranty of suitability in the sale of a tractor by a dealer, but emphasized that the dealer had specifically agreed to stand back of whatever representations had been made by the agent of the manufacturer. The purchaser had pointed out his special requirements in connection with a large farm and the agent had represented that the tractor would do certain specifically designated work for that particular farm. The court stated the rule:

" * * * The determination of whether or not there was an implied warranty was stated as follows: 'We think appellant's evidence tended to make a case where the seller contracted to furnish an article for a

particular purpose, the buyer trusting to the judgment of the seller that the article is suitable for that particular purpose, rather than a case where the buyer contracted for a definite, known, and described article and relied upon his own judgment of its suitability for such purpose'. Under this holding, the factors required were (1) the seller undertaking to furnish for a particular purpose, and (2) the buyer relying on the seller's judgment. * * *

"The term 'particular purpose', as used in the Hunter case, means a special purpose as distinguished from the ordinary use of the article in question."

One great trouble in attempting to state what the law of warranties generally may be, lies in the fact that, at common law, the views of the various jurisdictions varied greatly from one another, so that it was impossible to speak only of majority and minority rules. Thus, we are confined in the instant case to the law of implied warranties as declared in Missouri.

■ The law of the place where the sale was made and executed although the parties may have resided elsewhere governs as to whether warranties are to be implied or not. 46 Am.Jur. § 332, p. 515.

The law of implied warranties in Missouri is exhaustively discussed by Lee-Carl Overstreet, Professor of Law at the University of Missouri in Missouri Law Review, Vol. 10, [1945] pages 147 to 194, inclusive. In this article the writer discusses the opinion of the Supreme Court in the Jones Store case, herein cited, and, on page 148 states:

"In view of the apparent trend of decision in the various Courts of Appeals of Missouri in the recent past toward the view that warranties of fitness for particular purposes were to be liberally implied, the decision of the Supreme Court came as a shocking surprise. Considered as an exercise in abstract logomachy, the decision is an air-tight proposition. Considered as an attempt to dispose of a problem in the fields of retail marketing and consumer protection, the decision is unsatisfactory in that it fails to consider any relevant factors in those fields, but confines itself solely to the juggling of abstract rules of law purportedly deduced from prior decisions of the Supreme Court. Considered as an instance which presents an opinion of a Court of Appeals as being in conflict with controlling previous decisions of the Supreme Court, the decision fails to convince this writer that any conflict existed."

In Barton v. Dowis, 315 Mo. 226, 285 S.W. 988, 989, 51 A.L.R. 494, relied upon by the Supreme Court in the Jones case, the opinion of the court reiterated the proposition that: "In the sale of animals, the rule of caveat emptor applies, and there is no implied warranty that the animals are free from disease" but stated that "Where an article is sold for a special purpose, it carries with it a warranty that it is fit for that purpose".

In the instant case an automobile may fulfill many of the general duties of the automobile and, yet, be unfit for a particular purpose in a particular locality. Unless, therefore, a purchaser makes full disclosure of the particular, as distinguished from the general, use to which he intends to put the automobile under the Jones case he could not claim protection upon an implied warranty of fitness. An automobile is capable of many uses, the aggregate of which may be said to be its general purpose.

In M.L.R., Vol. 10, (1945) p. 186, the following statement is made:

" * * * What is the law of Missouri on this point today? If an answer is presently to be found, it will be in the decisions of the three Courts of Appeals, which are, and have been, writing most of the cases having to do with implied warranties in this state, when left to their own devices.

"The deciding of only 13 cases by the Supreme Court in the field of implied warranties in the 124 years of its existence means that, on the average, 1 case in that

field was handled by that Court every 9½ years. It means, also, that there are only 13 cases in that field to which the Court can look for guidance. The deciding of 89 cases by the Courts of Appeals in that same field in the 69 years since the first Court of Appeals came into existence means that, on the average, slightly under 1.3 cases in that field were handled by those Courts every year. It means, also, that there are 89 cases in that field to which those Courts, and sometimes the Supreme Court, can look for guidance. If frequency of decision in a given field results in familiarity with that field—and I think that it *should*—it would seem that the Courts of Appeals are quite familiar with the law of implied warranties. If infrequency of decision in a given field results in unfamiliarity with that field—and I think that it *might*—it would seem that the Supreme Court has not had the opportunity to familiarize itself with the law of implied warranties as it has grown, and in its modern applications, to the same extent as have the Courts of Appeals. I believe that this familiarity, and unfamiliarity, are perfectly and precisely illustrated by the decisions of the Kansas City Court of Appeals and the Supreme Court in the Marra case and the instant case, respectively. * * * The Supreme Court will, of course, have the final word as to what the law on this matter will be but, absent an examination of the entire field by the Supreme Court and its decision of the matter, the existing Courts of Appeals decisions must serve as guides until they are either overturned, or approved, by the Supreme Court."

If we follow the Jones case, cited by defendants, then we must adhere to the doctrine that except those where implied warranty of fitness for a particular purpose remove them from the operation of the general doctrine of caveat emptor there is no implied warranty. Most modern authorities now state that an article in order to be merchantable should be reasonably fit for the general purpose for which it is manufac-

tured. M.L.R., Vol. 10 [1945] p. 189, and authorities cited therein.

Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 143, 156 A.L. R. 469, states this law: "The evidence does not tend to show that defendant-respondent undertook to furnish the cutting-off wheel for a particular special purpose, as distinguished from the ordinary use of the wheel, and that plaintiff was relying upon the judgment of defendant-respondent that the wheel was suitable for the particular special purpose. Absent such a showing there was no implied warranty of the suitability of the article sold. State ex rel. Jones Store Co. v. Shain, 352 Mo. 630, 179 S.W.2d 19."

It would seem that the Supreme Court in this opinion still follows the old caveat emptor doctrine, to-wit, that if the buyer purchases an article of general usage he must protect himself by securing a warranty. So far as we can find this is the last expression of the Supreme Court on the doctrine of implied warranty of sales.

The rule followed by the Supreme Court was stated in Hunter v. Waterloo Gasoline Engine Co., Mo.Sup., 260 S.W. 979, 972, in which the court quoted 35 Cyc. 399 as follows:

" 'There is no general implication of warranty that the goods sold are fit for the purpose for which they are purchased if the seller is not informed of such purpose, especially where the buyer inspects or has an opportunity to inspect the goods; but an implied warranty of fitness will arise if they are purchased for a particular purpose of which the buyer informs the seller, and the rule applies especially if the seller is a dealer in the article or is the manufacturer thereof.' "

Plaintiff cites Dubinsky v. Lindburg Cadillac Co., Mo.App., 250 S.W.2d 830. This case, decided by the St. Louis Court of Appeals, follows the modern trend of decisions in other jurisdictions and in the other courts of appeals in this state. On page 832 of the opinion, the law is stated:

"In the sale of an automobile there is an implied warranty that it is reasonably fit for the use intended. Harvey v. Buick Motor Co., Mo.App., 177 S.W. 774. In the event of breach the purchaser has two remedies, (1) he may keep the vehicle and recover from the seller the difference in value between the chattel as warranted and its actual value in view of its defective condition, or (2) he may, within a reasonable time, return the car to the seller and recover the full purchase price." Harris v. Weber Motor Car Co., 212 Mo.App. 107, 251 S.W. 121.

The courts of appeals in this state do not cite or refer to the opinions of the Supreme Court and are in conflict therewith.

For discussion of implied warranty generally see Vol. 10 A.L.R. [Perm. Ed.] (Sale) § 57, p. 86; 46 Am.Jur. (Sales) § 332, p. 513; 77 C.J.S. Sales § 325, p. 1176; 59 A.L.R. p. 1180; Blashfield's Cyclopedia of Automobile Law and Practice, Vol. 7, [Perm.Ed.], §§ 4501–4504, pp. 370, 374, 378.

It has been held that implied warranties, unlike express warranties are arrived at by operation of law and conclusions announced by the court upon established facts. They are based wholly on implications of law as distinguished from inferences or implication of fact. Belt Seed Co. v. Mitchelhill Seed Co., 236 Mo.App. 142, 153 S.W.2d 106. See 20 Words & Phrases, for all the definitions of Implied Warranty.

■ We are cognizant of our duty to follow the last opinion of the Supreme Court upon a matter, yet, in the instant case, implied warranties of fitness have not been before the Supreme Court for such a long time that that court has not had opportunity to consider modern conditions and, since the more recent opinions in Missouri have been by the courts of appeals and they have followed the more recent holdings of the courts of our country that there is an implied warranty in the sale

of an automobile that it be reasonably fit for use intended, we find against defendants on this alleged error.

■ Error is assigned to the giving of plaintiff's instruction 1, first, because it ignores plaintiff's own pleading of an express warranty, and ignores the question of the giving of an express warranty introduced in evidence by defendants, and, therefore, ignores one of the issues in the case.

We find there is no merit in the contention that the instruction is erroneous because it ignores plaintiff's own pleading of an express warranty. It is true that the petition pleads that defendants warranted, both by implication and by their contract in writing, the car to be new, in first class condition, of superior quality and free from any and all defects. In the trial plaintiff offered no evidence to support the allegation of warranty by contract in writing and the cause was submitted solely upon the theory of implied warranty.

■ The law was properly stated by the Supreme Court in Stupp v. Fred J. Swaine Mfg. Co., Mo.Sup., 229 S.W.2d 681, 685 [3] as follows: " * * * No citation of authority is needed that instructions must be within the scope of the pleadings and the evidence." Krelitz v. Calcaterra, Mo.Sup., 33 S.W.2d 909, 911 [6]; White v. Thompson, Mo.App., 176 S.W.2d 53; Wilt v. Waterfield, Mo.App., 310 S.W.2d 24, 28 [1–2]; Banta v. Union Pacific Railroad Co., 362 Mo. 421, 242 S.W.2d 34.

It is further contended that the instruction ignores the express warranty, introduced in evidence by the defendants, which is an issue in the case.

■ It is a cardinal principle of law that the court shall instruct only on issues made by the pleadings and supported by the evidence. Johnson v. Thompson, Mo.App., 236 S.W.2d 1, 11 [16].

In Litt v. Allen, Mo.App., 313 S.W.2d 183, 187 [6–7], the law was stated by the St.

Louis Court of Appeals: "* * * The general rule is well settled that instructions should be confined to the issues made by the pleadings, and that error cannot be predicated upon the refusal to give an instruction which is based on an issue not raised by the pleadings. Stupp v. Fred J. Swaine Mfg. Co., Mo.Sup., 229 S.W.2d 681; Bourne v. Pratt & Whitney Aircraft Corp. of Missouri, Mo.App., 207 S.W.2d 533; Banta v. Union Pacific R. Co., 362 Mo. 421, 242 S.W.2d 34; Cochran v. Jefferson County Lbr. Co., Mo.App., 132 S.W.2d 32; Stokes v. Godefroy Mfg. Co., Mo.Sup., 85 S.W.2d 434."

■ The issue of the written warranty was not raised in the petition nor was it pleaded by defendants affirmatively. The defendants' answer to the petition of plaintiff was a general denial. Defendant Scism testified that at the time of the sale and delivery of the car to plaintiff, he delivered to plaintiff a written warranty which defendants offered in evidence as their exhibit (B). By the terms of this warranty all other warranties were expressly excluded. This evidence was offered without objection on the part of plaintiff. However, plaintiff, in rebuttal, testified she did not receive the warranty.

In De Winter v. Lashley, Mo.App., 274 S.W.2d 40, 43 [2], our court stated the law thus:

"It is held, as a general proposition, that an instruction authorizing a verdict for the plaintiff which ignores a pleaded defense upon which evidence has been introduced, and which has not been abandoned, is bad. * * *

"But as to defensive matters, that is, matters which are not essential to the plaintiff's cause of action but are a part of the evidence by which defendant hopes to defeat plaintiff's case, a mere omission (as distinguished from an exclusion or positive misdirection which would result in a conflict in the instructions) is cured by defendant's instructions which require such fact to be found or which direct a verdict upon the finding of such facts."

In the instant case defendants did not submit their theory of the case by instructions. They did offer an instruction on damages under the express warranty but this instruction is insufficient to present defendants' theory. If defendants do not submit their defense of written warranty, which was supported by their evidence, plaintiff should not be required to hypothesize for recovery any facts which go beyond plaintiff's own theory of recovery. Easterly v. American Institute of Steel Construction, 349 Mo. 604, 162 S.W.2d 825, 827 [2–3]; Shepard v. Harris, Mo.Sup., 329 S.W.2d 1. Under the law, defendants' failure to submit their theory of the case by instruction, the same is abandoned even though it is supported by evidence and it no longer remains an issue in the case. Lewis v. Oliver, Mo.App., 220 S.W.2d 748, 752; Shepard v. Harris, supra, and authorities cited therein; Zambruski v. Ludewig, Mo. App., 110 S.W.2d 825.

■ We agree with the law, cited by defendants, as stated in Hunt v. Sanders, 313 Mo. 169, 281 S.W. 422, to the effect that plaintiff could not have both an exclusive express warranty and an implied warranty but we do not agree with defendants' conclusion that instruction No. 1, given for plaintiff, permitted the jury to find that there was both an express warranty and an implied warranty.

The authorities cited by defendants, do not support their contention because the facts of the cases so cited are different from the facts in the instant case. For instance, Kitchen v. Pratt, Mo.App., 324 S.W.2d 778, written by this court, is cited. There, plaintiff offered uncontradicted evidence which showed she had no right to recover and we held that under such circumstances plaintiff could not ignore this testimony in her main instruction. Under the facts in the instant case we cannot condemn the instruction on the grounds assigned.

 Under this allegation of error complaint is made that the instruction tells the jury that defendants impliedly warranted the vehicle to be in first class condition and free from defects, thereby telling the jury that the vehicle is perfect. Defendants say that the instruction is erroneous because the law does not impliedly warrant the vehicle to be perfect and free from defects but only reasonably fit for the purpose for which it is sold.

Harvey v. Buick Motor Co., Mo.App., 177 S.W. 774 is cited as authority for this contention. On page 775 [2] the court stated this law: "There is no implied warranty of more than that the machine shall be reasonably fit for the purpose for which it is sold. Absolute perfection is not implied."

We think this alleged error is well taken. Plaintiff's instruction No. 1 is so worded as to give the jury to understand that perfection was required. It tells the jury that if they believe and find from the evidence that defendants sold plaintiff a new Ford automobile for her own personal use, thereby warranting said new automobile to be new, in first class condition and free from defects. This is a misdirection of the jury as to the law of implied warranty and is reversible error. It, likewise, is confusing. It is hard to determine whether or not plaintiff by this instruction was trying to submit express warranty as pleaded in the petition and which was not supported by any testimony.

In Dubinsky v. Lindburg Cadillac Co., Mo.App., 250 S.W.2d 830, 832 [2–4], the court reaffirmed the law as declared in Harvey v. Buick Motor Co., Mo.App., 177 S.W. 774, and stated:

"In the sale of an automobile there is an implied warranty that it is reasonably fit for the use intended."

Error is charged in the giving of instruction No. II, which is a damage instruction. We think this instruction is subject to the complaints made against it, but, since the case must be reversed and retried, we deem it unnecessary to pass on this and other allegations of error alleged in defendants' brief.

Judgment reversed and remanded for retrial.

RUARK, J., concurs.

STONE, P. J., concurs in the result.