Vera Austin MILLER, (Plaintiff) Respondent,

v.

ANDY BURGER MOTORS, INC., (Defendant) Appellant.

No. 30996.

St. Louis Court of Appeals.

Missouri.

Sept. 17, 1963.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 14, 1963.

Robert Lee Campbell, Buckley & Campbell, St. Louis, for appellant.

Sidney W. Horwitz, Dubinsky & Duggan, St. Louis, for respondent.

J. P. MORGAN, Special Commissioner.

Plaintiff instituted this action to recover for breach of warranty in the sale of an automobile, and defendant has appealed from the resulting judgment entered on a jury verdict for plaintiff in the amount of $2,213.12.

On October 21, 1957, plaintiff agreed to purchase from defendant a new Fairlane 500 Ford automobile, with delivery to be made in a few days. By the testimony of both parties, as well as the invoice dated that day, it appears that the agreed sales price of the new Ford was $3,429.00, payable by a cash payment of $1,275.00, plus a trade-in allowance on plaintiff's used Chrysler automobile of $2,154.00.

Two days later a sales representative of defendant called that the new automobile was ready for delivery, and that evening plaintiff, accompanied by her sister and brother-in-law, went to defendant's garage. While there she made the cash payment, and the salesman handed her a copy of the sales invoice and a printed Authorized Ford Dealer's Service Policy. In addition to providing for a 1,000 mile inspection

service, one paragraph captioned Warranty Service provided: "Should the replacement of any part become necessary under the warranty, we, the selling dealer, will make the replacement without charge to you for the part or labor required to replace the part * * *." On the reverse side, one-third of the page was identified as a Dealer Warranty. It limited the period covered to 4,000 miles or 90 days from date of delivery. After other exclusions, the last sentence provided: "This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations or liabilities on the part of Dealer, except such obligation or liability as Dealer may assume by its Authorized Ford Dealer's Service Policy or separate written instrument."

Plaintiff testified that the salesman suggested a demonstration ride to acquaint her with the car, and apparently her complaints started with the first trip around the block. She thought it had what she described as a burned odor, and was told this was typical of new cars. When they returned to the garage, she inquired as to how to turn on the heater, and as the salesman turned it on, water ran out on the floor. He advised this was from the ventilators as it had just been washed, but did console her by telling her to bring it back if it caused any trouble. Upon arriving home, she stated that the carpeting on the floor was wet, water was "gurgling", and that she was unable to turn off either the heater or head lights. By phone she was advised by the salesman to drive to some service station and have the heater disconnected and lights checked. Plaintiff did this, and it was found that the lights were grounded. The station attendant corrected the lights and tied off the heater hose.

The next morning she was at the service entrance of defendant's garage before it opened as the family had planned a trip for that day. She testified: "* * * I asked them to give me my Chrysler back and they could have this car and they said, no, they couldn't do it." She then described defendant's efforts this day by saying that about

five mechanics went to work on it. They took the floor carpeting loose and put lights under it; they found that the motor heated; they removed the heater and after welding it replaced it over plaintiff's request for a new heater; the inside of the left door was removed and work was done on the channels to allow the window glass to go up and down. She was then advised by the service manager that the trouble had been corrected and she could make her trip.

The car again became very hot on the way to her home, and by phone was advised to start her trip the next day, and to go by some Ford garage if it continued to run hot. She did this, but at another agency, Suburban Ford Motor Company, she was told to take it back to defendant. She did return and was told by the service manager that they didn't know what was wrong with it or how long it would take to fix it. At this time the salesman with whom she had traded, suggested she make the trip in his demonstrator. After returning three or four days later, she phoned that she had returned and requested they return her car and pick up the demonstrator. Again she was told, "Well, it isn't ready; they still don't know what's wrong with it; they are still working on it." Further phone calls were followed by a letter to defendant.

Plaintiff testified that a person identifying himself as Andy Burger called on November 13, and among other things said: "Now, I have five representatives from Ford Motor Company in here, and they have told me to pull the motor out of this automobile, one like you purchased, and put in this car." Plaintiff said she objected and stated she didn't want a repaired car, but a new one like she had paid for. In any event, someone delivered the car to her on November 18 and put it in her garage, with her comment being, "You are putting this in my garage over my objections."

From this date until the middle of February, 1958, the car was worked on at various times, with a letter from plaintiff to defendant dated January 6, 1958, listing other complaints. They included: continued leak from heater, excessive use of oil, engine "ping", noise in the rear end, motor skips as if automatic choke cuts in and out, directional signals didn't work, gas fumes in car, brakes did not hold or operate properly, it drove as if power steering wasn't working, and a generalized comment that, "In fact, the engine chugs along just like a little toy car and it is hard to tell which is going to fall out first, the front end or the back end."

Plaintiff testified these difficulties continued, and that she left numerous phone calls at the garage that were never answered by Mr. Burger, with the last being in June, 1958. She did admit driving approximately one to two thousand miles a month (during the time it wasn't in the garage), until she left it at defendant's garage on August 6, 1958. On that date she parked in front and handed the keys to Mr. Burger's son-in-law. As she was leaving, he threw the keys at her feet. She left the car, but two days later the bank where she had borrowed the cash payment called that the motor company had put the car on their parking lot. Plaintiff then stored it in a warehouse of her employer, and in October, 1958, sold it to Gilbert Buick, Inc. for $1,600.00. She testified to having owned twelve automobiles and driving for forty-one years, before expressing an opinion the Ford had a value of $1,500.00 when delivered to her.

The sister of plaintiff confirmed many of the complaints mentioned. The deposition of one Bob Fry identified him as the owner and operator of a driving school, and he had experienced difficulty with the brakes of this car while driving it in a funeral procession during July, 1958. He testified that he had purchased and sold cars in the operation of his driving school, and thought that the car at that time would have a reasonable market value of $1,500.-00.

The testimony of a William M. Watson was also given by deposition. He was em-

ployed by the same company as plaintiff as chief warehouseman. His duties required his participation in the purchase and trade-in of five to ten automobiles per year for his employer. He rode to and from work in a car pool arrangement with plaintiff, and had driven her car several times from November, 1957, to March, 1958. He described the steering by stating, "Well, the steering at that time was rough, you couldn't get a good steer. It was rough or shaky or whatever you want to call it and it was hard to turn." This condition was present each time he drove it, and he also mentioned the noise in the rear-end as well as the heater not working. Upon inquiry he expressed an opinion as to the market value of the car as of that time, and he placed it in a range from thirteen to seventeen hundred dollars.

Mr. Burger, for the defendant, testified he knew of plaintiff's complaints, but indicated the water stoppage was the only one of any significance. He said the block assembly was changed, "because the water wasn't circulating properly through the block due to some stoppage in the manufacture of the block." He thought the last time the car was in his garage was January 8, 1957, and after the major repair, "the car drove normal to me." He also denied any knowledge as to any phone calls allegedly left for him after that time by plaintiff.

After the trial court sustained plaintiff's objection, defendant made an offer of proof that it followed a custom of the automobile industry by giving a discount on the purchase price of the new car to be reflected in an over-allowance for the trade-in, which in this case defendant claimed to be $750.00, and a further offer to show that the used Chrysler taken in the exchange was in fact sold to some third party for $750.00 less than the amount allowed plaintiff.

The last witness called was the used car manager of Gilbert Buick that had purchased the Ford from plaintiff. He testified that the $1,600.00 paid plaintiff was

the wholesale value of the Ford, and that after a minor adjustment on the brakes had sold it to his brother-in-law for $1,900.00.

The verdict of the jury was for $1,829.00 (the exact difference between the original purchase price of $3,429.00 and the resale price of $1,600.00) plus interest of $384.12.

■ Defendant contends that the trial court erred in overruling its Motion For a Directed Verdict at the close of all the evidence, because (1) plaintiff failed to prove that she had advised defendant of any particular use for which she intended to use the automobile which would justify any finding of an implied warranty; and (2) the evidence showed that plaintiff accepted and relied upon a written express warranty which excluded all other warranties. The latter apparently assuming that defendant-seller had complied with the limited Dealer Warranty delivered to plaintiff-buyer. If that assumption is correct, plaintiff could not recover at all if the law does not impose a warranty that this car was of reasonable fitness for average usage as a new automobile.

The question has arisen in numerous cases involving automobiles that have been shown to be defective in construction or performance, and no requirement has been imposed on a purchaser in such actions to prove that the seller was specifically informed as to any particular use for which the vehicle was purchased. The early case of Harvey v. Buick Motor Company, Mo. App., 177 S.W. 774 said:

> "It is well known that an automobile is composed, in part, of machinery which, if not properly constructed or placed, will render the machine unfit for use. The law is that there is an implied warranty that such machines are reasonably fit for and adapted to the use and purposes for which they are made and sold. (Cases cited)."

In a case factually very similar to the instant case this court held, in Dubinsky v. Lindburg Cadillac Co., Mo.App., 250 S.W.

2d 830, 1. c. 832: "In the sale of an automobile there is an implied warranty that it is reasonably fit for the use intended."

The case of Mullins v. Sam Scism Motors, Incorporated, Mo.App., 331 S.W.2d 185, reviews the development of the law of implied warranties. However, in view of defendant's argument that before any warranty could have been implied, plaintiff should have advised defendant the "particular" use she intended to make of this particular automobile, some comment is required. It is apparent from the evidence in this case that plaintiff intended to use it as an ordinary means of transportation as is customary by the buying public. If "particular" means unique, special, or something clearly distinguishable from ordinary usage, any explanation of anticipated use by her would have been futile and have created no protection against any contingency. With the mechanical complexities of the modern automobile being far beyond the comprehension of the average buyer, even with inspection, fairness demands some protection for the buying public, with at least an assurance a new automobile, although not required to be perfect, will at least give average service. The requirement that there be an affirmative disclosure of a "particular" use as a condition precedent could more reasonably be applied to a purchase which would, in fact, be unique or special, such as stunt driving, track racing, mountain climbing, or any other particular use obviously calling for stress or strain not generally provided for in the original mechanical design of the automobile. The rule as now developed by the decided cases cannot be called an unreasonable imposition on the auto industry, with its continued use of all advertising media to further extend all warranties in the eyes of the buying public.

The further question arises as to whether or not all implied warranties were excluded by the express written warranty handed plaintiff just before she left defendant's garage. The law on the subject is fully reviewed in the case of Mitchell v. Rudasill,

Mo.App., decided by this court in 332 S.W. 2d 91, at 1. c. 95, 87 A.L.R.2d 1309, wherein it was said:

" * * * While it has been stated, as defendant urges, that an express warranty excludes an implied warranty, this has been criticized as too broad a statement of the rule. Williston on Sales, Rev.Ed., Vol. 1, p. 625, Sec. 239a. A more accurate statement of the correct rule is that an express warranty excludes an implied warranty of fitness (1) if the express warranty is inconsistent with the warranty which would have been implied had none been expressed; or (2) if the express warranty relates to the same or a similar subject matter as one which would have been implied."

The Dealer Warranty is so limited that it could accurately be concluded that it does not come within either of the exclusions; however, under the facts of this case, such a decision need not be made, because the "disclaimer", previously quoted as a part of the same instrument, if effective, would be an absolute barrier to the submission of any theory of implied warranty. In 77 C.J. S. Sales § 301, p. 1115, an express warranty is defined as follows:

"A warranty is a statement or representation made by the seller of goods, contemporaneously with, and as a part of, the contract of sale, although collateral to the express object of it, having reference to the character, quality, or title of the goods, and by which he promises or undertakes to insure that certain facts are or shall be as he then represents them. * * * *A warranty is express when the seller makes an affirmation with respect to the article to be sold, pending the treaty of sale, on which it is intended that the buyer shall rely in making the purchase: * * * Stated otherwise, an express warranty is one imposed by the parties to the contract. * * *"* (Emphasis added).

■ The defense that the parties expressly limited the extent of the warranties is an affirmative defense that must be pleaded and proven. Witte v. Cooke Tractor Co., Mo.App., 261 S.W.2d 651. Defendant's answer alleged: " * * * defendant states that defendant issued to plaintiff a dealer warranty which by its express terms excluded any and all other warranties of whatsoever nature."

■ However, a detailed search of the record reveals that the proof of this allegation was limited to an admission by plaintiff on cross-examination that defendant's salesman on the evening that she took delivery of the car, two days after the agreed sale and purchase, did hand her the Dealer Warranty. No evidence was offered that it was even identified at the time, nor that any of its provisions played any part whatsoever in the actual purchase. There being a complete failure of proof to sustain the affirmative allegation, the trial court properly overruled defendant's Motion For a Directed Verdict, as well as refusing to give the offered instruction calling for submission on the theory of express warranty.

■ Defendant next assigns as error the court's refusal to admit testimony that the sale price listed on the invoice was substantially in excess of the actual value at the time of sale. The case of Wind v. Bank of Maplewood & Trust Co., Mo.App., 58 S. W.2d 332, is cited as authority for this contention. There the court stated an accepted rule, 58 S.W.2d l. c., 334:

" * * * where the writing is a mere acknowledgment, statement, or receipt, constituting a mere written admission of a transaction independently existing or consummated, it is to be clothed with no contractual force and effect, and is open to contradiction, variation, or addition by parol."

The rule would be inapplicable in this instance. There was no dispute as to both parties agreeing on a purchase price of $3,429.00. Defendant's offer was not to deny this fact, but to explain "why" it did. Although perhaps of interest, in the absence of any evidence that plaintiff was a party to or aware of the "why", it would not have been binding on her and was properly excluded. The same would be true of defendant's effort to show the price for which it sold the used Chrysler trade-in to some third party. Schroeder v. Zykan, Mo.App., 255 S.W.2d 105, 112(17).

■ Defendant next contends that the portion of plaintiff's verdict-directing Instruction relating to damages failed to set out the proper measure of damages in a suit for breach of implied warranty. That part reads as follows:

" * * * assess plaintiff's damages in an amount being the difference between the purchase price of said automobile and the market value of said vehicle in the condition it was in, not to exceed however, the sum of $1829.-00, together with interest at six (6) per cent per year from August 6, 1958."

The primary complaint being that "value of the automobile had it been as warranted" should have been used instead of the words "purchase price of the automobile." Plaintiff submits that purchase price, when agreed upon by both seller and buyer, is in fact the only warranted value known to the purchaser. She also refers to numerous cases cited in Words and Phrases, under titles—Price or Value—stating that although they are not necessarily synonymous, they are often legal equivalents. The early case of Narr v. Norman, 113 Mo. App. 533, 88 S.W. 122, is of interest on this question. There it was stated:

"The basic principle controlling the measure of damages in such cases is full compensation for the actual loss sustained by the injured vendee * * hence the rule generally followed of permitting a recovery for the difference between the actual value of the article sold and its value in the condition

warranted. * * * The purpose of the rule is to give the vendee the benefit of his bargain, as a part of his actual loss, should it appear that the market value of the article, as warranted at the time and place of delivery, exceeded the contract price. * * * But it is not true, as urged by defendant, that, in the event it is shown that the vendee paid more for the article than its reasonable market value, his recovery is controlled by the latter amount, and not by the purchase price. In no event is the vendor to be suffered to profit by his wrong. He must reimburse the vendee for the actual loss sustained * * * the instruction given on plaintiff's behalf, which permitted the jury to 'allow him the difference between the price paid for the hogs and the actual value,' would have been without prejudice to the defendant. * * *"

■ It is established that if the contract is affirmed, the purchaser's recovery is generally based on the difference between actual value and warranted value; but, if the contract is rescinded, the purchaser's damages, if any, are determined from the original amount paid or purchase price. Dubinsky v. Lindburg Cadillac Co., supra; Salmon v. Brookshire, Mo.App., 301 S.W.2d 48; 37 C.J.S. Fraud § 143, p. 478.

■ The instant case was submitted on a theory of rescission of the contract by plaintiff, and the Instruction given correctly sets out the proper measure of damages. It appears that the jury determined the actual value of the automobile in its defective condition to be $1,600.00, and deducted this amount from the purchase price. The value as found was within the range of values given by plaintiff's witnesses, which varied from $1,300.00 to $1,700.00. The fact that the actual value as determined by the jury was the same amount for which plaintiff resold the automobile is not necessarily indicative that the Instruction as to damages was not followed. It is true, of course, as indicated in the Dubinsky case, supra, that a seller cannot be penalized if the purchaser's resale price is below the actual value. Defendant correctly contends that actual value of the defective vehicle is to be determined as of the date of delivery, but there is no merit to its argument that the Instruction was so punctuated as to designate August 6, 1958, as the time for determining such value. It is quite clear that the date given was designated as the time from which interest might be calculated. However, although not assigned as error by defendant, to avoid being misleading, it should be pointed out that the correct date would have been October 23, 1957, because a rescinding purchaser may be allowed interest from date of payment. Schroeder v. Zykan, supra. Interest allowed plaintiff might have been greater, but the question is not now for decision. Defendant did not by its pleadings seek any allowance for plaintiff's use of the automobile in its defective condition. Witte v. Cooke Tractor Co., supra.

Having found no error materially affecting the trial of this cause, your commissioner recommends that the judgment be affirmed.

PER CURIAM.

The foregoing opinion by J. P. MORGAN, Special Commissioner, is adopted as the opinion of the Court.

The judgment of the trial court is affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.