**N. E. PATON, Jr., Appellant,**

v.

**BUICK MOTOR DIVISION, GENERAL MOTORS CORPORATION, a corporation, et al., Respondents.**

**No. 51244.**

Supreme Court of Missouri,
Division No. 1.

March 14, 1966.

Rehearing Denied April 11, 1966.

Elwyn L. Cady, Jr., Kansas City, for appellant.

John Murphy, Paul Scott Kelly, Jr., Kansas City, Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, for respondent, Buick Motor Division, General Motors Corporation.

WELBORN, Commissioner.

N. E. Paton, Jr., brought suit against Buick Motor Division of General Motors

Corporation and several individual defendants, seeking actual damages of $6,000 and punitive damages of $42,000 for alleged breach of implied warranty arising from the sale to plaintiff of a Buick automobile. On a trial without a jury, the court found for defendants and this appeal followed. We are concerned here only with the liability asserted against General Motors (referred to herein as "Buick"), no complaint being made against the judgment in favor of the individual defendants.

■ On or about July 1, 1959, plaintiff purchased from Don Stein Buick, Inc., of Mission, Kansas, a 1959 Buick Le Sabre 4-door hardtop sedan for approximately $4,400.00. (Delivery of the vehicle took place at Stein's place of business in Kansas, which would make Kansas law govern the issues here presented. See Mullins v. Sam Scism Motors, Inc., Mo.App., 331 S.W.2d 185, 193[1]. However, neither party has seen fit to rely on Kansas law.) According to plaintiff, he had a date with a Stein employee a few days after the auto was delivered and she pointed out to him that the motor was missing. Plaintiff had previously observed this difficulty a few hours after the auto was delivered to him. This was the onset of a long series of complaints about the workmanship in the manufacturing, and the quality and performance of the automobile which led to the filing of this lawsuit on March 7, 1961. The complaints forming the basis of the petition were:

"That shortly after sale of the auto in question, numerous defects in the performance of said vehicle were discovered by plaintiff and disclosed to defendants, to-wit: that the electrical system constantly shorted-out; that the voltage regulator was faulty; that there was a loose control on the doors with defects in the power windows; that there was repeated failure of directional turn signals; that the dynaflow transmission functioned improperly; that there was difficulty in acceleration of the vehicle; that the front end balljoint system was defective, thus permitting a dangerous drift of the auto wheels; that there were numerous mechanical vibrations of the motor and its attachments; and that the motor stalled suddenly, unexpectedly, and without warning from time to time."

At the trial, plaintiff, the only witness in his behalf, described his difficulties with the vehicle as follows:

"We have had considerable trouble with the electrical system in the automobile, we could not keep light bulbs in the automobile, in a good many instances they kept blowing. The voltage regulator in the automobile was never steady, it had constant fluctuations. When it did stop charging the fans and the lights and even the radio would lose volume, the lights would go down. The power windows we have had some trouble with, quite a bit, the two front windows have been broken and subsequently repaired, the back right window has never worked from the switch on the door, the front control which operates all four controls came off in my hand one day. The control on the front door itself has always been loose since the purchase of the automobile. I have had considerable trouble with the directional signals on the car, they would not stay locked down in many instances. The gasoline mileage on the car when I first got it was between seven and eight miles per gallon, the car used approximately two quarts of oil between changes which were made between approximately 1,000 and 1200 miles. The car has a constant surge and hold back in it. From the time we purchased the automobile it was noticeable in putting the automobile in traffic around the area or on the highway. It also did not have a passing gear that worked as a passing gear in a dynaflow should work in my estimation.

\* \* \* \* \* \*

"\* \* \* In other words, when you put your foot down on the accelerator sometimes it would catch and sometimes it wouldn't.

\* \* \* \* \* \*

"Sometimes I was caught in the left hand lane with the passing gear unable to work and in trying to pass another automobile with another car coming at me.

\* \* \* \* \* \*

"The car has been sluggish. There was lean spots in the acceleration where the accelerator would go through as you pushed it down, areas where there would be actually no acceleration at all, no effect upon the movement of the automobile. It also would catch as it went down. The car wouldn't move during some periods. When it got down to one point it would grab and go out. The front end of the automobile was extremely hard to keep in line, was extremely hard on tires.

\* \* \* \* \* \*

"It caused the car to drift, remain unsteady, it caused you to have a constant fight with the steering wheel of the automobile to hold it in line. There is a vibration in the automobile which has always been there regardless of slow or fast speeds. The front end of the automobile is sinking down and the back end was considerably higher than the front end. I have reference to the dash pot on the carburetor which was set so high, the car, you would have to hold down the brake to get the car idled down. There was vibration in the steering column of the automobile which you could feel in the steering column and you could also hear it rattle. We had considerable trouble with the engine just absolutely dying in the middle of the street as though somebody would turn the key off to the motor."

At the time of the trial in September, 1964, plaintiff was still driving the auto and had driven it approximately 73,000 miles. He stated that defects of which he had complained had never been remedied. There was evidence of considerable repair and replacement work on the vehicle in an effort to satisfy plaintiff's complaints. Much of the work was done at Buick's expense, "under warranty." Plaintiff produced bills for repair work on the auto done by others at his expense on such items as brakes, the starter, the electrical system, transmission, carburetor, shock absorbers and front-end suspension system, totaling, to August, 1964, some $320.00.

Defendants' witnesses generally testified that they could not discover many of the defects about which plaintiff complained. Mark Stevermer, a training center instructor for Buick, stated that when he, plaintiff and other Buick representatives road tested the vehicle in December, 1959, plaintiff's complaints were of hesitation on acceleration and "wander." Stevermer testified that he and plaintiff drove the car on that occasion and that he did not observe the conditions about which plaintiff complained. Stevermer found the steering and accleration "standard" on that occasion.

In May, Stevermer took the auto and kept it for two days. He examined it at that time particularly for complaints about the handling or steering, "hesitation," oil consumption and a rattle in a door. A nylon wedge was inserted to take care of the door rattle. The only thing which he noticed about the steering was that "if you grabbed the steering wheel, it had a little end play in it." According to the witness, they "took that out." A check of the power steering mechanism showed nothing wrong. A spring on the accelerator was replaced and, when hesitation was noticed on a road test, Stevermer "blew out" the muffler and found no further hesitation. He found no evidence of excessive use of oil and concluded that complaint on that score was caused by the light weight oil used. According to Stevermer, he drove with plaintiff in the car after he had checked it and plaintiff "was satisfied with all of it." However, on the way back to the dealer, plaintiff "floor boarded it \* \* \* to change the switch pitch on it and at the bottom of the throttle the thing was a little bit slow."

Lowell Boyer, Buick service manager for the Kansas City zone, testified that he drove the car in December, 1959 or January, 1960,

in May, 1960 and in October, 1960, and could find nothing wrong with it. In October, he took the car into a shop and put it on the "front end" machine but could find nothing wrong. Boyer stated that on a comparative basis he "would say the car was much better than the average car perhaps that I might be driving at the time."

David Kobe, owner relations manager for Buick, testified that he drove the car in November, 1959, and "thought it was a very normal automobile." He drove the car again later on and "couldn't find the condition (plaintiff) was talking about." Kobe thought "the car was very normal."

Roger Redd, an appraiser employed by defendants to examine plaintiff's auto, took the car on September 3, 1964, and tested it for the various defects which plaintiff had alleged. He found only that one of the power-operated windows did not work from one switch because of a broken wire and that the operation was sluggish because the motor needed a major tune-up, a normal requirement in an auto that had been driven 73,000 miles.

At the close of the evidence, the trial judge stated:

"THE COURT: Gentlemen, you have spent a couple of days on this matter. You have a case of defects in an automobile bought by an owner and layman which have not been substantiated in any way by testimony, expert testimony or any kind of testimony other than the statement of the plaintiff. On the other hand both the defendant Stein and Buick Motor Division of General Motors Corporation have produced evidence here they have taken this man's car and his ideas and statements as to what is the matter with it and to me they made every effort to remedy such mistakes. There was no evidence there was anything the matter with the car they could find upon his statement. We all realize we have cars that don't exactly suit us. I don't think under the evidence and under the law [of] warranty the plaintiff is entitled to anything, a judgment for anything."

At the outset of our consideration, we shall endeavor to delimit the issues which appear to us to be here presented and necessary for us to determine on this appeal. Appellant's two allegations of error are: First, that the uncontroverted testimony of defendants' witnesses established at least a slight breach of the warranty sued on and therefore the trial court should have found for plaintiff and have at least awarded nominal damages. Second: "The court erred in its view of the law since Missouri does recognize the doctrine of strict liability for breach of warranty of quality." In support of the latter proposition, plaintiff cites Morrow v. Caloric Appliance Corp., Mo.Sup., 372 S.W.2d 41. The doctrine of strict liability eliminates the necessity of privity of contract in certain actions based upon breach of warranty. See Lauer, "Sales Warranties Under The Uniform Commercial Code;" 30 Mo.Law Rev. 259, 277–280. Defendants here do not assert absence of privity between them and plaintiff as a defense. Therefore, we need not consider appellant's second assignment of error.

The defense here rests upon two propositions. First: "An implied warranty, if any, was disclaimed by the terms of the express warranty." Second: "Even if there was an implied warranty, there was no breach." Inasmuch as there is doubt that the evidence established the express warranty upon which defendants rely to exclude all implied warranties, we will consider only the second proposition, urged, in effect, in answer to plaintiff's first contention.

In reviewing the matter on this basis, we keep in mind the function of this court. This case was tried as a jury-waived action. We review the cause "upon both the law and the evidence as in suits of an equitable nature." However, the judgment is not to be "set aside unless clearly erroneous." Civil Rule 73.01(d), V.A.M.R.

Although we do not find in plaintiff's brief a clear statement of the warran-

ty upon which he relied in this action, plaintiff apparently is standing upon an implied warranty of quality or merchantability. Plaintiff makes some reference to Buick's advertising as the basis of the warranty involved. The casual reference to this subject is insufficient to support a conclusion that a warranty arose from Buick's advertisements. Turner v. Central Hardware Co., 353 Mo. 1182, 186 S.W.2d 603, 606 [1–3], 158 A.L.R. 1402.

The uncontradicted testimony to which plaintiff points as establishing a breach of an implied warranty of quality is the testimony of Buick's witness, Stevermer, that, on his May 5, 1960 test of plaintiff's auto, he found a "little end play" in the steering mechanism; that there was some hesitation in response to application of the throttle, and that the change of pitch in the automatic transmission operation was "a little bit slow." However, the witness testified that the first two items were remedied with only minor changes and adjustments. He did not testify that anything was done to improve the efficiency of the transmission system. However, he described the reaction as only "a little bit slow" and subsequent checks by defendants' witnesses revealed no difficulty in this regard.

Plaintiff also points to the numerous items that were taken care of by Buick under its warranty policy, such as replacing the fuel pump, replacing the carburetor, etc.

■ However, the test of breach of warranty of quality or merchantability, as applied to an automobile, is not whether a perfect machine was sold to the purchaser, but whether the vehicle was reasonably suitable for the ordinary uses for which it was manufactured. 1 Williston, Sales (1948 rev. ed.), § 243, pp. 641–642. See Mullins v. Sam Scism Motors, Inc., Mo. App., 331 S.W.2d 185; Harvey v. Buick Motor Co., Mo.App., 177 S.W. 774; Miller v. Andy Burger Motors, Inc., Mo.App., 370 S.W.2d 654.

■ Here, the credible evidence failed to show that plaintiff's automobile was not reasonably suitable for ordinary use. Even considering all of plaintiff's complaints as well-founded, his automobile was better beyond comparison than those involved in Mullins and Miller, supra. However, the trial court clearly did not consider all of plaintiff's complaints well-founded. With this conclusion we agree. We note that, despite the complaint of the defects which plaintiff claims were never remedied, he operated the vehicle for 73,000 miles. In his effort to enlarge the expenditures which he claimed to have made at independent repair shops because of the defects, he produced a bill for tires on his brother's auto. When challenged, plaintiff withdrew this claim. When a claim for the cost of replacing a muffler in August, 1959, was challenged as not for the Buick, plaintiff acknowledged that he did not know whether it was for the Buick or his brother's car. Plaintiff stated: "I will claim it now. If it is a muffler used on his car, I will be glad to take it off." Numerous other claimed expenditures were for obvious regular maintenance items and the trial court disallowed their introduction into evidence.

Discounting plaintiff's testimony as we must because of the obvious exaggeration of the nature and seriousness of his complaints, we reach the same conclusion as the trial court that there was no breach of the warranty relied upon. See Adams v. Peter Tramontin Motor Sales, Inc., 42 N.J. Super. 313, 126 A.2d 358, 359, 364 [7]; Fillet v. Curry, 12 A.D.2d 519, 207 N.Y.S. 2d 522.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.