L. Dwayne BRUTON and Farm Bureau Town and Country Insurance Company of Missouri, a corporation, Plaintiffs–Respondents,

v.

SHELTER MUTUAL INSURANCE COMPANY, Defendant–Appellant,

and

Joy Ann Grabeel, Personal Representative of the Estate of Billy Jackson Grabeel, Defendant.

No. 15103.

Missouri Court of Appeals, Southern District, Division One.

Feb. 5, 1988.

Motion for Rehearing and Transfer to Supreme Court Denied Feb. 26, 1988.

Application to Transfer Denied April 19, 1988.

Kenneth H. Reid, Sherry A. Rozell, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendant-appellant.

Richard J. Collins, C. Blake Wolf, Collins, Webster and Rouse, P.C., Joplin, for plaintiffs-respondents.

No appearance for Joy Ann Grabeel, Personal Representative of the Estate of Billy Jackson Grabeel.

CROW, Chief Judge.

Louie Dwayne Bruton ("Bruton") and Farm Bureau Town and Country Insurance Company of Missouri ("Farm Bureau") brought this declaratory judgment action seeking, among other things, a determination that a policy of insurance issued by Shelter Mutual Insurance Company ("Shelter") provided coverage for Bruton "in any action arising out of the accident ... on December 2, 1983 involving ... Billy Jackson Grabeel...." Named as a defendant (in addition to Shelter) was Joy Ann Grabeel, personal representative of the estate of Billy Jackson Grabeel.[1]

The trial court heard the cause without a jury and thereafter on December 24, 1986, filed an extensive memorandum of factual findings and legal conclusions. On January 12, 1987, the trial court entered a "Judgment and Decree" in which appeared fewer findings of fact and conclusions of law. The judgment provided, among other things, that Shelter's policy "does provide insurance coverage ... as to collision cov-

1. It was stipulated that Billy Jackson Grabeel died April 22, 1985, some 16 months after the accident. Shelter's brief avers he died "from an unrelated cause." That allegation is unchallenged.

erage and as to the liability of ... Bruton arising out of the accident ... on December 2, 1983...."

Shelter appeals, briefing three assignments of error. A conspectus of the pertinent facts is essential in understanding the issues. The facts we narrate are among those found by the trial court in its memorandum of December 24, 1986. All are supported by substantial evidence.

The saga began in 1979 when Jerry Dan Pratt ("Jerry"), a resident of Rogers, Arkansas, and his wife, Evangeline, purchased a 1969 Chevrolet Camaro, obtaining an Arkansas certificate of title in the names "Jerry and/or Evangeline Pratt."

The next relevant event occurred in the summer of 1983. At that time, Jerry was engaged in the automobile repair business in Rogers under the name "Auto Clinic of Rogers, Incorporated." He and Evangeline decided to transfer title to the Camaro to the corporation. They filled in and signed the assignment form on the back of the certificate of title, but did not immediately send it to Arkansas authorities for the issuance of a new certificate of title to the corporation because their license tags were not due to expire until May, 1984.

Bruton, a Missouri resident employed as a salesman by a firm in Golden, Missouri, was making regular sales visits at Jerry's place of business. In late October or early November, 1983, Bruton commenced discussions with Jerry about purchasing the Camaro. They eventually agreed on a price of $6,700.

On Wednesday, November 23, 1983, in Rogers, Bruton gave Jerry a $6,700 check. Jerry told Bruton it would be necessary to send the title certificate to Arkansas authorities to obtain a certificate of title in the name of the corporation. When the new certificate of title was received, Jerry would assign it to Bruton. Jerry also agreed to repair any defects in the Camaro.

The Camaro, at that time, was identified as the insured vehicle in an automobile insurance policy issued by Shelter. The

named insureds were "Jerry and/or Evangelina Pratt." [2] The policy, which was due to expire December 16, 1983, provided collision coverage (with a deductible amount), bodily injury liability coverage with a limit of $25,000 per person, and property damage liability coverage with a limit of $25,000 per accident. Jerry told Bruton that if the Camaro were wrecked, Jerry's insurance would take care of it.

Bruton took possession of the Camaro—on which were displayed license tags issued to Jerry and Evangeline—and drove it to his home in Missouri.

On Thursday, November 24, 1983,[3] or the following day, Jerry mailed the title certificate to the state agency in Little Rock that handles transfers of Arkansas motor vehicle titles. On November 25, Jerry deposited Bruton's check in an account in a Rogers bank in the names of Jerry and Evangeline.

On Sunday, November 27, 1983, Bruton drove the Camaro back to Rogers and left it with Jerry for repairs. It remained there until Friday, December 2, 1983, when Bruton took possession and drove it back to Missouri. Later that day (December 2), while Bruton was driving the Camaro in Springfield, Missouri, it collided with a vehicle operated by Billy Jackson Grabeel. Grabeel sustained severe injuries. The Pratts' license tags were still on the Camaro. The title certificate was in the hands of Arkansas authorities in Little Rock.

The day after the collision, Bruton informed Jerry about it by phone. Jerry, who had not yet told Shelter of the Camaro transaction, suggested it would be a good idea if there were a bill of sale. One was prepared that day (December 3) in Arkansas, backdated November 23, 1983. It recited that "Jerry D. or Evangeline Pratt do sell, transfer, and deliver" the Camaro to Bruton. It was signed by Jerry, alone, and was not "notarized." The following day (Sunday, December 4, 1983), Jerry delivered the bill of sale to Bruton.

2. There is no contention that the Evangelin*a* Pratt named in the policy is someone other than Jerry's wife, Evangeline.

3. Thanksgiving.

Shifting our focus temporarily to the pleadings, we note that Bruton and Farm Bureau averred in their petition that prior to November 23, 1983, Farm Bureau had issued a policy of insurance to Bruton on another automobile, insuring him "for acts of liability" in the amount of $25,000 for personal injury and $10,000 for property damage, and providing "comprehensive and collision coverage." The petition further alleged that Farm Bureau had paid Bruton $6,873, and was subrogated to Bruton's interest "to the extent of said amount." Shelter, in its answer, admitted those allegations.

The parties stipulated that on December 15, 1983, Farm Bureau issued a policy to Bruton identifying the Camaro as the insured vehicle and providing bodily injury liability coverage of $25,000 per person, property damage liability coverage of $10,000 per accident, and comprehensive and collision coverage. The beginning date of the policy period, as shown on the declaration sheet, is "11–23–83." The trial court held that by such policy Farm Bureau provides liability coverage for Bruton in regard to the accident of December 2, 1983. That ruling is unchallenged.

Returning now to the facts found by the trial court in its memorandum of December 24, 1986, we learn that several weeks after the accident Jerry received a certificate of title to the Camaro in the name of the corporation. He promptly assigned it (presumably as an official of the corporation)[4] to Bruton, and Bruton picked it up in Rogers.

Bruton and Farm Bureau pled in their petition that Joy Ann Grabeel, in her representative capacity, had asserted a claim against them for the injuries sustained by Billy Jackson Grabeel, that Bruton and Farm Bureau might be adversely affected by such claim, and that consequently they requested a judicial declaration of the "obligations of the respective insurance companies" and a determination as to which company should defend Bruton against such

claim. Joy Ann Grabeel and Shelter, in their separate answers, admitted those allegations.

Under a provision of Shelter's policy captioned "PERSONS INSURED,"[5] coverage was provided for any person using the Camaro within the scope of permission granted by Jerry or Evangeline. Mindful of that provision, the trial court, in its memorandum of December 24, 1986, stated:

"The issues ... concern whether ... the coverage of ... Shelter ... applies to the liability of ... Bruton arising out of the collision. The issues turn upon the question of whether either or both of the Pratts were the owners of the [Camaro] at the time of the collision. If they were the owners, then ... Bruton was a permissive user and has the benefit of the liability insurance coverage. If they were not the owners, then the [Shelter] policy no longer provided coverage for Bruton as an operator of the Camaro."

The trial court ruled that inasmuch as all of the activity affecting ownership of the Camaro prior to the collision had taken place in Arkansas, the question of whether the Pratts owned the Camaro when the accident occurred was to be decided under Arkansas law. In that regard, said the trial court:

"Arkansas is a state in which title passes in accordance with the intention of the parties, without regard to the assignment of title."

The trial court then stated there was no direct evidence of the intention of the parties "concerning when legal title would transfer to the Camaro." Consequently, concluded the trial court:

"The Court is required to rely upon presumptions concerning the intention of the parties for the delivery of title. Evidentiary presumptions are a matter of the law of the forum, the State of Missouri."

Addressing that subject, the trial court examined *Allstate Insurance Co. v. Hartford Accident & Indemnity Co.*, 311 S.W.

---

4. The certificate of title was not in evidence at trial and does not appear in the record on appeal.

5. Footnote 6, *infra*.

2d 41 (Mo.App.1958), where, as in the instant case, two insurance companies sought a determination as to which one provided primary liability coverage for the driver of a motor vehicle. In that case, as here, the seller of the vehicle had turned possession of it over to the buyer without the simultaneous delivery of a duly assigned certificate of title. The buyer, within 15 minutes after obtaining possession, was driving the vehicle and was involved in a collision. All those events took place in Missouri. The appellate court noted that under § 301.210, RSMo 1949, it was unlawful to buy or sell any motor vehicle registered in Missouri unless at the time of the delivery there passed between the parties a certificate of title, and that a sale without such assignment was fraudulent and void. *Id.* at 46. The opinion declared that if the court viewed the transaction as an attempt to make a completed sale, then the transaction was wholly and completely void, because the law so made it. *Id.* at 47. The opinion continued:

> "If we regard it as an executory contract to complete a sale in the future (as we think we must so view it, because we will not presume that the parties intended to do an illegal and unlawful act), then the user of the car pending completion was by consent and permission of the seller." *Id.* at 47[10].

As the seller's insurance policy in *Allstate* provided coverage for any person using the vehicle with the seller's permission, the court held that such policy afforded coverage for the driver.

Endeavoring to apply the principles of *Allstate* to the instant case, the trial court declared:

> "On November 23, 198[3], legal title was in the name of a corporation called Auto Clinic of Rogers, Inc. Nevertheless, on that date the certificate of title was in the name of individuals, Jerry and Evangeline Pratt, and no certificate of title was in the name of the corporation. There is no evidence to indicate that Jerry Pratt was anything more than a shareholder and a manager of the activities of the corporation. . . .

> The Court is aware of the informal manner in which closely held corporations are operated and will assume, although there is no evidence, that Jerry D. Pratt was an officer of Auto Clinic of Rogers, Inc. with authority to sell and transfer title to the Camaro on behalf of the corporation on November 23, 1983 and at all times thereafter.

> . . . .

> The only reason the certificate of title was not delivered at the time of possession, as required by Missouri law, was that it was not available for assignment. In fact, at that point, the corporate owner of the Camaro was in violation of the Statutes of Arkansas, in that [an Arkansas statute] denominates the operation of a motor vehicle for which a certificate of title has not been issued or applied for within the time period prescribed by law to be a misdemeanor and [another Arkansas statute] requires the transferee to present the assigned certificate of title with an application for a new certificate of title within 10 days after the vehicle is operated on the Arkansas roadways. Missouri Statutes, on the other hand, do not permit any such leeway. Mr. Bruton's operation on the Missouri roadways required him to refrain from operating unless he applied for Missouri license tags. He was required to have a certificate of title assigned to him before he could apply. . . . Therefore, if the Court were to believe that the parties intended legal title transfer to the buyer, then the Court must also believe the parties intended to violate both the Statutes of Arkansas and the Statutes of Missouri[.] The evidentiary presumption is otherwise.

> Consequently, the Court does find that the parties did intend an executory contract of sale and that there was no intention that the legal title to the Camaro transfer until the buyer, Mr. Bruton, was capable and able to apply for valid registration in the State of Missouri. . . ."

At the foot of its memorandum, the trial court requested the attorney for Bruton and Farm Bureau to prepare a judgment in accordance therewith. Judgment, as re-

ported earlier, was entered January 12, 1987, and contained sundry findings of fact and conclusions of law. They were, in all essential respects save one, consistent with those in the memorandum. The exception was conclusion of law number "2" in the judgment:

"Under Arkansas law, ... Bruton, Jerry Pratt and Evangelina Pratt did intend an executory contract of sale and there was no intention that the legal title to the Camero [sic] transfer until the buyer, ... Bruton, was capable and able to apply for valid registration in the State of Missouri, therefore, Jerry Pratt and/or Evangelina Pratt were the owners of the ... Camero [sic] at the time of the accident on December 2, 1983."

A perspicacious reader will immediately espy an apparent conflict between conclusion "2," above, and the trial court's proclamation in its memorandum—quoted earlier—that the *corporation*, Auto Clinic of Rogers, Incorporated, was the owner of the Camaro on November 23, 1983.

Shelter's first point is:

"The [trial] court erred in finding that the parties did not intend to transfer legal title to the [Camaro] on November 23, 1983, in that the court applied a presumption that the parties intended to act in accordance with Missouri and Arkansas law regarding assignment of a certificate of title when they sought to transfer ownership of the [Camaro] without delivery of the certificate of title whereas the court should have followed the applicable Arkansas law to the effect that presumptions are inapplicable and that the actual intent of the parties to the transaction controls whether the transfer of the [Camaro] was effective and should have found and concluded (1) that, under Arkansas law, the evidence showing that the parties' actual intent was to transfer legal title on November 23, 1983, controlled, (2) that ownership of the [Camaro] was transferred on that date and (3) that [Shelter's] policy thus was not applicable to the underlying claim."

Shelter's position, as we comprehend it from the argument following its first point, is that (a) the question of who owned the Camaro at the time of the accident on December 2, 1983, is to be determined by Arkansas law, (b) the presumption applied by the trial court, i.e., that the parties to the sale intended to conform to Missouri and Arkansas law, is a *substantive*—not *procedural*—provision of Missouri law, (c) the trial court should have therefore decided the ownership issue without utilizing such presumption, and (d) there was "ample evidence" that Bruton and Jerry intended a "final sale" of the Camaro on November 23, 1983. Shelter, as we read its brief, maintains that under Arkansas law, ownership of the Camaro passed from the Pratts to Bruton on November 23, 1983, consequently Bruton was not driving the Camaro with the permission of the Pratts on December 2, 1983, but was instead driving it in his own right as owner. That being so, argues Shelter, Bruton was not a permissive user under the Pratts' Shelter policy.

Bruton and Farm Bureau respond that the trial court properly found, pursuant to applicable Arkansas law, "that the parties did not intend to transfer legal title to the ... Camaro on November 23, 1983." According to Bruton and Farm Bureau, there was substantial evidence "to establish that the parties to this transaction did, in fact, intend an executory contract and, in the interim, Bruton was a 'permissive user' and did not have an ownership or insurable interest in said vehicle." Thus, they say, Bruton was covered by the Pratts' Shelter policy when the accident occurred December 2, 1983.

As we analyze the case, we need not decide whether the trial court was correct in applying the "presumption" that the parties, in consummating the sale of the Camaro, did not intend to act contrary to Missouri or Arkansas law.

We begin our ratiocination by recognizing that the dispositive issue is whether the Pratts owned the Camaro on December 2, 1983. If they did, it is clear—under the facts found by the trial court—that Bruton was driving the Camaro with Jerry's per-

mission when the accident occurred, and was consequently an insured under the Pratts' Shelter policy.[6] It is likewise clear, as we shall presently see, that if the Pratts did not own the Camaro on December 2, 1983, Bruton was not an insured under the Pratts' Shelter policy.

The first step in resolving the ownership issue is to determine whether it is to be decided under Arkansas law or Missouri law. Shelter, as we have seen, asserts that Arkansas law applies; we find nothing in the brief of Bruton and Farm Bureau challenging that premise.

The closest Missouri case we find on the subject is *Auffenberg Lincoln–Mercury, Inc. v. Wallace*, 318 S.W.2d 528 (Mo.App. 1958). There, an Illinois resident bought an automobile in Illinois from an Illinois corporation, making a down payment and executing a promissory note for the balance, secured by a conditional sales contract. The buyer later moved to Missouri, bringing the automobile with him. When he became delinquent on the note, the seller repossessed the automobile and resold it. In a lawsuit that followed, one of the issues was whether the rights of the parties under the conditional sales contract were to be determined by Illinois law or Missouri law. The court held Illinois law applied.

A federal case remarkably similar to the instant case is *Switzer v. Carroll*, 358 F.2d 424 (6th Cir.1966). There, two brothers were partners in an automobile repair business in Virginia. They entered into an insurance contract in Virginia providing liability coverage for any automobiles owned by them in connection with their business. Coverage extended to any member of their households. One of the partners had a son residing in his household. The son was employed by the partnership. The partners purchased an automobile, obtaining a Virginia certificate of title and Virginia license tags. A few months later, the son drove the automobile to Ohio on business for the partners. After arriving there, the

son decided to sever his employment with the partnership and remain in Ohio. He so informed his father by phone. The partners decided to give the automobile to the son. Pursuant to that decision, the father, acting for the partnership, assigned the Virginia certificate of title to the son, acknowledged it, and mailed it to the son in Ohio, instructing him to have title to the automobile registered in Ohio and return the Virginia license tags. Several days thereafter, while operating the automobile solely for his own purposes in Ohio, the son was involved in an accident, precipitating a lawsuit against him. At the time of the accident the automobile still bore the Virginia license tags, and no Ohio certificate of title had been obtained. The trial court ruled that under Virginia law the partners no longer owned the automobile at the time of the accident, an effective gift of it having been made to the son. Accordingly, the trial court held there was no liability coverage under the partners' insurance policy. On appeal, the judgment creditor of the son contended that the question of who held legal title to the vehicle at the time of the accident should have been determined under Ohio law. The appellate court concluded that under Virginia law, the partners effectively transferred their interest in the automobile to the son when the partner-father assigned the title certificate and delivered it to the son. The appellate court further held that even though the son had not fulfilled the requirements for titling the automobile in Ohio (and thus would not be recognized as owner of the automobile there), Ohio would nonetheless accept the validity of the transaction under Virginia law by which the partners had divested themselves of ownership of the automobile. Hence, the trial court was correct in ruling that the partners' insurance policy afforded no coverage.

In *Austin v. River*, 95 Ohio App. 400, 120 N.E.2d 133 (1953), a motor vehicle owned

---

**6.** Part I of the Pratts' Shelter policy provided, in pertinent part:

"PERSONS INSURED

As used in this Part, **Insured** means:

(1) With respect to the **described auto,**

(a) **You,**

(b) **Your relatives,**

(c) Any other person using the **auto** if its **use** is within the scope of **your** permission, ...."

by the plaintiff, a resident of North Carolina, was damaged in a collision in Ohio. The plaintiff sued the tort-feasor in Ohio. Under Ohio law, title to a motor vehicle may be proved only by a certificate of title. The plaintiff testified he owned the vehicle, but presented no title certificate. The trial court denied recovery for that reason. The appellate court held that whether the plaintiff had title to the vehicle had to be determined by the substantive law of North Carolina, and hinged on whether the plaintiff had complied with the law of that state in respect to motor vehicle registration. 120 N.E.2d at 135[3]. The method of proof, however, is governed by the rules of Ohio. *Id.* The appellate court awarded the plaintiff a new trial.

In *Colby v. Long*, 289 F.2d 137 (6th Cir. 1961), the plaintiff, a resident of Michigan, was injured in a highway accident in Ohio while riding as a passenger in an automobile titled in Oregon. The Oregon title was in the name of the plaintiff and his son. The trial court, applying Ohio law, ruled that inasmuch as the plaintiff was an owner of the automobile, there was a presumption that he was in control of it and that the driver was his agent. As the presumption was not rebutted, the driver's negligence was imputed to the plaintiff. In Oregon, the registration of title is not conclusive, but only prima facie evidence of ownership of an automobile. *Id.* at 141[2]. The trial court excluded testimony tending to prove that the automobile actually belonged solely to the plaintiff's son, and that the plaintiff's name had been placed on the title certificate only to facilitate financing the purchase. The appellate court held that Oregon law was controlling on the ownership issue, and that the trial court erred in rejecting the proffered testimony.

In the instant case, the trial court correctly noted that prior to the accident, every event affecting ownership of the Camaro had occurred in Arkansas. That being so, we are persuaded by the four cases just discussed that the question of whether the Pratts owned the Camaro at the time of the accident must be decided under Arkansas law. Our holding is analogous to that in *Paton v. Buick Motor Division, General Motors Corp.*, 401 S.W.2d 446 (Mo.1966), a suit by the buyer of an automobile against the manufacturer and others for breach of implied warranty of merchantability. The automobile was purchased from a dealer in Kansas, and delivery took place there. The Supreme Court of Missouri held that Kansas law would govern the issues. *Id.* at 447[1].

We have already learned that the Pratts obtained an Arkansas certificate of title to the Camaro in their names when they purchased it in 1979, and that they filled in and signed the assignment form on the reverse side thereof in the summer of 1983, naming Auto Clinic of Rogers, Incorporated, as the assignee. The certificate was in that posture when Bruton handed his check to Jerry and took possession of the Camaro on November 23, 1983.

The trial court, as we understand the findings in its memorandum of December 24, 1986, concluded that the legal effect of the Pratts' assignment to the corporation was to divest them of ownership of the Camaro and vest ownership in the corporation. It will be recalled, however, that the trial court inserted in its judgment a conclusion that the *Pratts* were the owners of the Camaro when the accident occurred December 2, 1983.

For the reasons that follow, we need not fret about that apparent inconsistency, nor need we determine whether ownership of the Camaro passed from the Pratts to the corporation in the summer of 1983 when the Pratts filled in and signed the assignment form.

The record supplies scant information about the corporation. Jerry, testifying by deposition, confirmed that Auto Clinic of Rogers, Incorporated, was a corporation. Then, this:

"Q. Who else is involved with you in ownership of the corporation?

A. My older brother Bobby Pratt.

Q. Anyone else involved in the ownership?

A. No, sir."

The trial court, in a segment of its memorandum quoted earlier, found there was no evidence to indicate that Jerry was anything more than a shareholder and a manager of the corporation's activities.

While we have few details about Auto Clinic of Rogers, Incorporated, there is nonetheless ample evidentiary support for the trial court's finding that such entity was indeed a corporation. With that in mind, we turn our attention to the Arkansas statutes regarding ownership of motor vehicles. In doing so, we note that the statutes of Arkansas now appear in Arkansas Code of 1987 Annotated. However, as the events with which we are concerned occurred in 1983, we must identify the pertinent statutes in effect at that time.

We begin with Ark.Stat.Ann. § 75–111(a) (Repl.1979), which defined "person" as: "Every natural person ... or corporation." We next observe that the Camaro was a motor vehicle as defined by Ark.Stat.Ann. § 75–102(b) (Repl.1979) and, by reason of Ark.Stat.Ann. § 75–132 (Repl.1979), was subject to registration under Ark.Stat.Ann. § 75–133(A) (Repl.1979).

That statute, § 75–133(A), required every owner of a vehicle subject to registration to make application to the Title Department of the Motor Vehicle Division for registration of such vehicle and issuance of a certificate of title. Another statute, Ark.Stat. Ann. § 75–148(a) (Repl.1979), stated:

"Whenever the owner of a registered vehicle transfers or assigns his title, or interest thereto, the registration of such vehicle shall expire. The owner shall remove the license plate or plates and any plate sticker, metal tab or decal therefrom and forward the same to the department or may have such plate or plates and plate sticker, metal tab or decal and the registration number thereon assigned to another vehicle upon payment of the fees required by law and subject to the rules and regulations of the department."

Ark.Stat.Ann. § 75–149(a) (Supp.1985), in effect in November, 1983, provided:

"The transferee of any ... used motor vehicle required by law to be registered shall apply for or cause to be applied for the registration thereof within ten (10) working days after the date of the transfer. No such motor vehicle shall be operated upon a public street or highway for more than ten (10) working days after the transfer date unless a valid registration plate is properly attached thereto."

Ark.Stat.Ann. § 75–149(b) (Repl.1979) provided:

"A transferee shall at the same time present the certificate of title indorsed and assigned as hereinbefore provided to the department and make application for and obtain a new certificate of title for such vehicle...."

Ark.Stat.Ann. § 75–157 (Repl.1979) provided:

"The owner of a motor vehicle who has made a bona fide sale or transfer of his title or interest and who has delivered possession of such vehicle and the certificate of title thereto properly indorsed to the purchaser or transferee shall not be liable for any damages thereafter resulting from negligent operation of such vehicle by another."

Section 75–157, above, was relevant to the dispute in *Rook v. Moseley*, 236 Ark. 290, 365 S.W.2d 718 (1963). There, an Arkansas certificate of title to an automobile named C.C. Rook or Mrs. C.C. Rook as the owners. There was evidence that C.C. Rook undertook to sell the automobile to one Livingston for $200, that Livingston paid $50 in cash, and that he was to pay the balance in monthly installments of $50. There was no contemporaneous writing to evidence the alleged sale. Three days later Livingston was driving the automobile and it collided with another vehicle. The occupants of that vehicle sued Livingston and C.C. Rook. Liability against Rook was predicated on the theory that he, as an owner of the automobile, allowed Livingston to drive it as either a bailee or an agent, knowing that Livingston was a reckless driver and drove while intoxicated. Rook denied he owned the automobile at the time of the collision. The trial court submitted the ownership issue to the jury, which resolved it adversely to Rook. The

appellate court, after quoting § 75–157, stated:

"It is not claimed that Rook ever properly endorsed the title certificate to the purchaser or transferee so as to be exempted from liability under this section. Of course, if he had made a bona fide sale to Livingston before the traffic mishap such could have avoided his liability." 365 S.W.2d at 720[4].

The appellate court held the ownership issue was properly submitted to the jury.

Two other cases are instructive on the ownership issue: *House v. Hodges*, 227 Ark. 458, 299 S.W.2d 201 (1957), and *Hardware Dealers Mutual Fire Insurance Co. v. Holcomb*, 302 F.Supp. 286 (W.D.Ark. 1969).

In *House*, one Hopwood, a nonresident of Arkansas, employed an Arkansas attorney, Hodges, and an Indiana attorney to represent him in an action brought by one Roberson. In that action, an attachment had been levied on a pickup owned by Hopwood. Hopwood agreed to transfer the pickup to his attorneys in payment of their fees. Pursuant to the agreement, Hopwood sent Hodges a duly acknowledged bill of sale. Several months later the Roberson attachment was released and Hodges gave Roberson's attorney a check with the understanding that the pickup would be promptly delivered to Hodges. Three days later, Roberson's attorney advised Hodges the pickup would not be delivered because the attorney had filed suit for one House against Hopwood and had again attached the pickup. Hodges intervened in the new action, claiming ownership under the bill of sale. Affirming a judgment in favor of Hodges, the appellate court rejected House's argument that the attempted transfer of ownership was ineffective in that Hodges did not receive a certificate of title properly endorsed from Hopwood. The opinion said:

"We find nothing in the Motor Vehicle Act which states that a *bona fide* sale of

a vehicle cannot be made except by an immediate assignment of certificate of title. It is true that the purchaser cannot obtain a license, nor legally operate the vehicle without obtaining such certificate, and one so doing would be guilty of a misdemeanor, but the matter of obtaining the proper transfer lies between [Hodges] and Hopwood. The failure of [Hodges] to obtain the certificate of title at the time he received the bill of sale does not deprive him of title, for the certificate of title *is not title itself* but only *evidence of title*. 299 S.W.2d at 203–04.

In *Hardware Dealers*, one Holcomb owned an automobile covered by an insurance policy in which he was the named insured. Holcomb's daughter, Carolyn, agreed to take the automobile and assume the payments on it. She executed a note for the balance due the seller, and thereafter had exclusive possession of the automobile. Holcomb, however, did not notify his insurer of the transaction, thus the automobile continued to be listed on the policy. Some months later, Carolyn married one Perkins, and ceased to be a member of Holcomb's household. Carolyn never obtained a certificate of title, but did register the automobile in her own name and received a license tag for the ensuing year. Several months after the marriage, Perkins was driving the automobile and was involved in a collision. Holcomb's insurer sought a declaratory judgment that it had no obligation to defend a lawsuit against Holcomb and Perkins arising from the collision. The "Persons Insured" provision in Holcomb's policy, set forth below,[7] was similar to the one in Shelter's policy in the instant case. In *Hardware Dealers*, the plaintiff in the underlying accident suit contended that Carolyn never obtained title to the automobile, as the certificate of title was never assigned to her, thus Holcomb retained ownership of the automobile and it

---

7. Holcomb's policy provided, in pertinent part: "The following are insureds under the Liability Coverage:
   (a) with respect to an owned automobile,
   (1) the named insured,

(2) any other person using such automobile to whom the named insured has given permission, provided the actual use is within the scope of such permission.
...."

was covered by his insurance policy. Rejecting that hypothesis, the court held that possession of the automobile by Carolyn and her husband was by virtue of her ownership, and that the automobile was being operated at the time of the collision under her and her husband's own right and not with the permission of Holcomb. *Id.* at 291. Consequently, the provision in Holcomb's policy insuring any person using the automobile with permission of the named insured did not supply coverage for the accident, as the named insured, Holcomb, had no right or power to give permission to anyone because he was not the owner of the automobile. *Id.* at 290–91[2].

■ Having learned that ownership of a motor vehicle titled in Arkansas can pass from seller to buyer even without a contemporaneous assignment of the certificate of title, we are firmly convinced that in the instant case ownership of the Camaro passed from the Pratts to Auto Clinic of Rogers, Incorporated, no later than November 25, 1983. We base that conclusion on these facts: (1) Bruton gave Jerry a check for the full purchase price on November 23, and simultaneously took possession of the Camaro, (2) Jerry, on either November 24 or 25, mailed the certificate of title to Little Rock to obtain a new certificate in the name of the corporation, which could then be assigned to Bruton, and (3) Jerry deposited Bruton's check November 25.[8]

The trial court, as recounted earlier, found in its memorandum that ownership of the Camaro had passed from the Pratts to the corporation even earlier, i.e., the summer of 1983. We need not decide whether that premise is sound, for, as we shall see, a holding that the Pratts parted with ownership of the Camaro no later than November 25, 1983, is all that is necessary to resolve this appeal.

While it is inferable that Jerry's sole purpose in obtaining a certificate of title in the name of the corporation was to enable

ownership to then be transferred to Bruton, the fact remains that once Bruton was given possession of the Camaro, and the Pratts' certificate of title (previously assigned to the corporation) was sent to Arkansas authorities for the issuance of a new title in the name of the corporation, the Pratts had done everything required by Arkansas law to divest themselves of ownership of the Camaro and vest ownership in the corporation.

Analogous, though not identical, circumstances existed in *Warren v. Warren*, 253 Ark. 134, 484 S.W.2d 880 (1972). There, the Warrens bought an automobile for their son, Stanley, and put title in his name. A few months later, Stanley married Debbie. He gave the automobile to her, with the title being reissued in her name. Stanley and Debbie thereafter became estranged. Stanley's parents sued to recover the automobile. Stanley's mother testified that title was put in Stanley's name "for insurance purposes." The chancellor held that the automobile belonged to Stanley at the time he gave it to Debbie, and denied relief. Affirming, the appellate court emphasized that Stanley's parents took the inconsistent position of having sought on the one hand to retain ownership of the automobile while endeavoring on the other to defraud the innocent public by making it appear that their financially irresponsible son was in fact the owner. The court refused "to rescue the [parents] from a predicament of their own making." 484 S.W.2d at 881.

The lesson of *Warren*, as we fathom it, is that once an owner of a motor vehicle titled in Arkansas assigns the certificate of ownership to another, and a new certificate is issued in the name of the assignee, the former owner cannot successfully contend he still owns the vehicle.

In the instant case it is clear that Jerry opted—wisely or not—to carry out the sale to Bruton by transferring ownership of the Camaro from himself and Evangeline to

---

**8.** Jerry testified Bruton asked him (Jerry) to hold the check until November 25 because Bruton needed to sell some cattle "to make the check good." Bruton testified he gave Jerry a "postdated check" so that he (Bruton) would have time to "talk to the bank" and arrange a loan. Under either scenario, it is manifest that Bruton understood that Jerry would deposit the check November 25.

the corporation (if indeed that had not already occurred), thence to Bruton. As Jerry, once he mailed the assigned certificate of title to Arkansas authorities on November 25, 1983, had fulfilled every requirement of Arkansas law to transfer ownership of the Camaro from himself and Evangeline to the corporation, we are persuaded that under Arkansas law the Pratts no longer owned the Camaro after November 25, 1983.

Bruton and Farm Bureau also appear convinced. In their brief we find this:

> "In the case at ... bar, the evidence is uncontroverted as to the state of the title at the time of the accident. [Jerry] ... testified that he had assigned the title to ... Auto Clinic of Rogers, Incorporated.... In this light, it is clear that the corporation which is defined in Ark.Stat. Ann. § 75–111 as a 'person' as it is used in § 75–111(b) held legal title to the [Camaro].... As such, the corporation, Auto Clinic of Rogers, Incorporated, was the 'owner' as defined in Ark.Stat.Ann. § 75–111."

That conclusion brings the instant case squarely under the holding of *Hardware Dealers*, 302 F.Supp. 286. That case, as we have seen, held that inasmuch as ownership of the vehicle in question had passed from the policyholder to his daughter prior to the collision, the policy afforded no coverage for the daughter's spouse at the time of the collision, as the latter's operation of the vehicle was not by permission of the policyholder. The court in *Hardware Dealers* relied on 7 Am.Jur.2d *Automobile Insurance* § 115—now 7 Am.Jur.2d *Automobile Insurance* §§ 254 and 255, pp. 832, 834 (1980), where it is said:

> "The word 'permission' or 'consent' connotes the power to grant or withhold it, and therefore, in order for one's use and operation of an automobile to be within the meaning of an omnibus clause requiring the permission or consent of the named insured, the latter must, as a general rule, own the insured vehicle or have such an interest in it that he is entitled to the possession and control of

the vehicle and in a position to give such permission."

> ....

> If a valid sale has occurred and possession of the automobile is delivered to the buyer, subsequent use by the buyer is by virtue of his ownership of it and his right to control it, and not by virtue of the grant to him of any permission by the seller, and therefore cannot constitute use 'by permission' of the insured seller within the meaning of the omnibus clause provision."

*Hardware Dealers*, 302 F.Supp. at 291.

In the instant case, there is a paucity of information regarding where the Pratts entered into their insurance contract with Shelter. The policy's declaration sheet identifies the Shelter agent as Larry D. Garrett of Rogers, Arkansas. Jerry, in his testimony, confirmed that Garrett was the Shelter agent with whom Jerry had dealt. Jerry also recounted that he told Garrett about the Camaro transaction after the accident.

The parties stipulated that Shelter is a Missouri corporation authorized to engage in the insurance business in Arkansas.

The litigants, as we read their briefs, do not contend that the insurance contract between the Pratts and Shelter was made anywhere other than Arkansas. In resolving disputes regarding insurance contracts entered into in other states, Missouri courts have applied the law of the state in which the contract was made. *General American Life Insurance Co. v. Charleville*, 471 S.W.2d 231, 234[1] (Mo.1971); *Hayde v. Womach*, 707 S.W.2d 839, 841[1] (Mo.App.1986).

Applying Arkansas law as declared in *Hardware Dealers*, 302 F.Supp. at 290–92, to the coverage question, we hold that inasmuch as the Pratts no longer owned the Camaro at the time of the collision, Bruton's operation of the Camaro on such occasion was not by permission of the Pratts, therefore Shelter's policy afforded Bruton no coverage for the accident. It is immaterial whether Bruton's operation of the Camaro on December 2, 1983, was by permission of Auto Clinic of Rogers, Incorporated

(rather than in Bruton's own right as owner), as nowhere in the Shelter policy is such corporation listed as a named insured. Therefore, even if Bruton's operation of the Camaro on December 2, 1983, was by permission of such corporation—an issue we need not resolve—Bruton would not be an insured person under the Pratts' Shelter policy.

Having decided that, we need dwell no longer on Shelter's first assignment of error, nor need we consider its other two.

That portion of the trial court's judgment declaring that Farm Bureau's policy provides liability coverage for Bruton in regard to the accident of December 2, 1983, is affirmed. That portion of the trial court's judgment declaring that Shelter's policy provides collision coverage and liability coverage for Bruton in regard to the accident of December 2, 1983, is reversed. Costs of this appeal are taxed against Bruton and Farm Bureau.

GREENE, P.J., and HOLSTEIN, J., concur.